AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
OCT 23 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   **19MJ4652**
One iPhone 7 Plus Cellular Telephone, )
IMEI 356695088721789 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is incorporated by reference.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 952/960 | Importation of a controlled substance |

The application is based on these facts:
See Affidavit of Homeland Security Investigations Special Agent Samuel C. Goodwin, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Samuel C. Goodwin*
Applicant's signature

Samuel C. Goodwin, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 10/23/19

*/s/*
Judge's signature

City and state: San Diego, CA

Karen S. Crawford, Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Samuel C. Goodwin, having been duly sworn, do hereby state that the following is true to my knowledge and belief:

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic device:

> One iPhone 7 Plus
> IMEI No 356695088721789
> ("**Target Device**"), described in Attachment A (incorporated herein by reference)

seized from Myqui Isaya RECORD (RECORD) on September 15, 2019, incident to his arrest at the Otay Mesa, California, Port of Entry ("OTM") for drug smuggling, in violation of 21 U.S.C. §§ 952 and 960. The **Target Device** is currently in the possession of the Department of Homeland Security and is presently stored at the OTM vault located at 9777 Via De La Amistad, San Diego, CA 92154.

2. I seek authority to search the **Target Device** for evidence from June 1, 2019, through September 16, 2019, of crimes, specifically, violations of Title 21, United States Code, Sections 952 and 960, as described in Attachment B (incorporated herein by reference.)

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the information known to investigators about this investigation. It contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, conversations with other investigators experienced in the area of drug investigations, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

## TRAINING AND EXPERIENCE

4. I am currently a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been employed by ICE/HSI as a Special Agent since December 2018.

5. As a Special Agent for HSI, I am responsible for investigating laws enumerated in Title 8, Title 18, and Title 21 of the United States Code. Included in my responsibilities is the investigation of illicit contraband-smuggling, including narcotics-smuggling, across the United States border.

6. I have completed and graduated from the twelve-week Criminal Investigator Training Program as well as the fifteen-week Homeland Security Investigations Special Agent Training Program located in Glynco, Georgia at the Federal Law Enforcement Training Center.

7. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics smuggling generate many types of evidence including, but not limited to, evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, maps and directions, and phone numbers of co-conspirators.

8. Based upon my training and experience as an HSI Special Agent, and my consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I further submit the following:

   a. Drug smugglers use cellular telephones because the devices are mobile and provide instant access to telephone calls, texts, internet, application-based

*Affidavit in Support of Search Warrant*

communications platforms (*e.g.*, WhatsApp), and voice messages;

  b. Drug smugglers use cellular telephones because they are able to actively monitor the progress of the illegal cargo while the conveyance is in transit;

  c. Drug smugglers and their accomplices use cellular telephones because the phones help them arrange for the delivery of cargo at predetermined locations and monitor / plan for arrival times;

  d. Drug smugglers use cellular telephones to direct couriers to synchronize drop off and pick up times of the illegal cargo;

  e. Drug smugglers use cellular telephones to notify or warn accomplices about law-enforcement activity, such as the presence and posture of marked and perceived unmarked patrol vehicles, or the operational status of border checkpoints and border crossings; and

  f. Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

  g. The use of cellular telephones by smugglers tends to generate evidence stored on the cellular telephones, including but not limited to emails, text messages, application-based communications, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

  9. Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

  10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can

3

*Affidavit in Support of Search Warrant*

and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

   a.   tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

   b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

   c.   tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

   d.   tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

   e.   tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

   f.   tending to place in context, identify the creator or recipient of, or

*Affidavit in Support of Search Warrant*

establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS IN SUPPORT OF PROBABLE CAUSE

### A.  The Arrest

11.  According to a report prepared by Customs and Border Protection Officer S. Richardson, at approximately 10:28 p.m. on September 14, 2019, Myqui Isaya RECORD, a United States citizen, applied for entry into the United States from the Republic of Mexico at the Otay Mesa, California, Port of Entry (OTM) in vehicle lane #4. RECORD was the driver and registered owner of a grey 2008 Nissan Versa bearing California License Plate 8JZL885 ("the vehicle"). RECORD was accompanied by his 20-year old girlfriend, Leah Jane Jones.

12.  RECORD provided two negative customs declarations, told CBPO Richardson he was going to Perris, California, and claimed he had owned the vehicle for two months.

13.  Canine Enforcement Officer L. Boswell and K-9 "Kimi" screened the vehicle. CBPO Boswell instructed RECORD to place the vehicle in "park" and unlock the doors. CBPO Boswell allowed "Kimi" to conduct an interior sniff and she alerted on the rear cargo area between the rear seats. Officer Boswell tapped the gas tank, which tapped solid. Both RECORD and Jones were placed in handcuffs and escorted to the security office for further processing.

14.  After RECORD and Jones were removed, the vehicle was scanned by the Z-Portal X-Ray machine and anomalies were observed in the gas tank or under the rear seat bench of the vehicle.

15.  CBPO T. Hooper was assigned to conduct the secondary inspection of the vehicle. At the secondary inspection area, the back seat was removed, and tooling scratch marks were located on the sending unit seal. A contractor, Apple Towing, removed the sending unit and disposed of the fuel. In addition to removing approximately five gallons of fuel, the mechanic noted that the fuel gauge was intentionally broken. After the sending

unit and fuel were removed, black packages vacuum-sealed with clear plastic were located inside of the fuel tank. There were 31 black packages inside the fuel tank. Of the 31 packages, 30 were packaged the same and were crunchy to the touch. The one package that looked different from the other 30 packages was marked with a green marker, and felt extremely hard, in comparison to the other packages. The substance in the package marked with a green marker was tested positive for heroin. Two of the other remaining 30 packages field tested positive for methamphetamine. The total weight of the heroin was 1.08 kilograms and the total weight of the methamphetamine was 16.68 kilograms.

16. Per CBPO Hooper's report, after testing and weighing the substances, at approximately 12:45 a.m., RECORD and Jones were placed under arrest for the importation of controlled substances. CBPO Hooper seized the Nissan Versa, methamphetamine, heroin, the **Target Device**, and personal property from RECORD.

### B. RECORD's Statement

17. Following his arrest, RECORD received his *Miranda* rights from HSI Special Agent (S/A) Samuel Goodwin. RECORD stated he understood his rights, signed a Waiver of Rights form, and agreed to answer questions. RECORD acknowledged this orally, and by reading and signing the Waiver of Rights form.

18. During the interview, RECORD confirmed that he is the registered owner of the vehicle, and stated that he bought it 2.5 months ago from a friend. A copy of the registration card found in the vehicle indicates the registration fee was paid on July 19, 2019.

19. RECORD said that he and Jones drove from Perris, California, to Tijuana, Mexico, on September 13, 2019. Crossing records for the vehicle confirm that the 2008 Nissan Versa crossed from United States into Mexico on September 13, 2019, at 12:15 p.m. through the San Ysidro Port of Entry.

20. RECORD initially stated that Jones had never been to Tijuana, so they decided to vacation overnight there. As the interview progressed, RECORD admitted his main reason for going to Tijuana was to smuggle narcotics into the United States for $3,500

6

*Affidavit in Support of Search Warrant*

USD.

21. At approximately 5 p.m., RECORD and Jones arrived at a hotel, but he could not recall the name of the hotel because he did not read Spanish. When RECORD and Jones checked-in to the hotel, RECORD left the keys in the vehicle. The vehicle was picked up that evening for the narcotics to be concealed in the vehicle. That evening RECORD and Jones walked to a "taco truck" near the hotel and brought dinner back to the hotel room. They stayed inside the hotel room overnight.

22. The next day, they waited at the hotel for RECORD's vehicle to return. RECORD received a phone call on the **Target Device** from an unknown female that his vehicle would arrive in about 30 minutes. At approximately 9:00 p.m., the vehicle returned to the hotel. RECORD and Jones met a Mexican male, who delivered the vehicle and told them the car was ready to cross back over the border.

23. RECORD explained that if he crossed the border successfully, he would be told where to meet in Perris, California, via the **Target Device**. Once the vehicle arrived at the predetermined location, the vehicle would be taken to another location and the narcotics would be removed from the vehicle. RECORD's vehicle would eventually be returned to him with the $3,500 USD inside. RECORD stated that Jones did not know he was smuggling narcotics into the United States.

24. RECORD initially admitted that he knew he was smuggling illegal drugs in his vehicle into the United States, and that he was to be paid $3500 USD for the trip. However, towards the end of the interview, RECORD denied knowledge and stated that he only admitted so that the Homeland Security Investigations special agents would see that was willing to tell the truth. Nonetheless, RECORD admitted that he knew he was being paid to smuggle something illegal.

25. Jones, the passenger in RECORD's vehicle, was also interviewed and stated she did not know RECORD was smuggling anything in his vehicle. She claimed she was RECORD's girlfriend and they went to Tijuana because she had never been there before. She claimed she stayed in the hotel room most of the time during the trip. Jones had no

7

prior crossings, and no criminal charges were filed against her.

## C.  **Prior Narcotics Crossing**

26.  In addition to smuggling narcotics on September 14, 2019, RECORD also stated that he had been to Tijuana approximately two weeks ago, with a friend named "Alicia," later identified as Alicia Lindsay PRECIADO. RECORD claimed that he and PRECIADO arrived in Tijuana August 27, 2019. According to TECS crossing data, RECORD and PRECIADO crossed at OTM on August 28, 2019, approximately two weeks prior to RECORD's arrest in this case.

27.  During the August 28, 2019, RECORD was not told what he was smuggling, but he knew he was committing an illegal act. RECORD stated he was one of three or four vehicles that were going to smuggle something illegal to the United States.

28.  After RECORD crossed into the United States through OTM on August 28, 2019, he received a phone call on the **Target Device** from a Hispanic male with instructions on where to take the vehicle. RECORD transported PRECIADO to her residence and drove the vehicle near some warehouses in Perris, California, but does not remember the exact location. The vehicle was taken from him for approximately 30 minutes. When the car returned, there was $1,000 payment on the dashboard. RECORD stated he was recruited by PRECIADO and has known her for approximately five months.

29.  RECORD is charged via Information with importation of heroin and methamphetamine in Case No. 19CR4099-W. A Motion Setting hearing in that case is scheduled before the Honorable Thomas J. Whelan on October 28, 2019.

## D.  **Connection to Another Investigation**

30.  In his interview, RECORD claimed he was one of three or four vehicles that were smuggling on August 28, 2019. RECORD's crossing history shows that he and Alicia PRECIADO crossed together from Mexico into the United States on August 28, 2019, at 1:01 a.m., via OTM vehicle lane 4.

31.  At approximately 1:05 a.m. on August 28, 2019, Adrinna Danielle AHUMADA, and Christian ARCE-Morales applied for entry into the United States from

8

*Affidavit in Support of Search Warrant*

Mexico through the OTM in vehicle #4. AHUMADA was the driver and stated they were going to Perris, CA. ARCE was the passenger and registered owner of the vehicle. During inspection, CBPOs found 28 packages with a total weight of approximately 14.04 kilograms (30.95 pounds) in the driver and passenger side rear quarter panels. The substance inside the packages tested positive for methamphetamine.

32.  Both AHUMADA and ARCE denied knowledge of narcotics, and claimed they stayed at a hotel in Tijuana. Agents subsequently interviewed a friend of ARCE, Nathan Maldonado, who provided information about ARCE being recruited to smuggle money into the United States by "Alicia." Maldonado explained that ARCE and "Alicia" were at Maldonado's house on August 26, 2019. According to Maldonado, ARCE agreed to bring money from Tijuana into the United States in exchange for $3500. "Alicia" was identified as PRECIADO, the same individual who was crossing in the vehicle with RECORD on August 28, 2019, minutes before ARCE and AHUMADA.

33.  Based upon my experience and investigation in this case, I believe that RECORD, as well as other persons yet unknown, were involved in an on-going conspiracy to import heroin, methamphetamine, or some prohibited narcotics. Based on my experience and training, I also believe that RECORD may have used the **Target Device** to coordinate with co-conspirators regarding the importation and delivery of the heroin and methamphetamine, and to otherwise further this conspiracy both inside and outside the United States. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, messages sent via texting applications such as WhatsApp, email messages, messages and posts from social networking sites like Facebook, photographs, videos, and other digital information are stored in the memory of cellular telephones which identify other persons involved in narcotics trafficking activities.

34.  Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics

*Affidavit in Support of Search Warrant*

smuggling activities of RECORD and his co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, email messages, text messages, messages from texting applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, videos, and other digital information are stored in the memory of the cellular telephone described herein. Because the **Target Device** has been in the custody of HSI since the date of RECORD's arrest, I believe that this information continues to be stored on the **Target Device**.

35. Finally, I note that drug conspiracies generally entail detailed and intricate planning as part of efforts to evade detection by law enforcement. In my professional training and experience, I am aware that this requires planning and coordination in the days and weeks (and often months) prior to the relevant drug-related event. Additionally, I am aware that co-conspirators are often unaware of a subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their valuable cargo, particularly in the hours following the arrest. In this case, RECORD claimed he has known PRECIADO for five months, and purchased the vehicle 2.5 months prior to his arrest on September 15, 2019. Evidence supports that probable cause exists to search the **Target Device** for information dating back to June 1, 2019, which is approximately one and a half months before the vehicle registration payment was made, and approximately three and a half months before the crossing that resulted in the arrest. Therefore, I believe that the appropriate date range for the search of the **Target Device** is from June 1, 2019 up to and including September 16, 2019 (*i.e.*, the day after the events described in this affidavit).

## METHODOLOGY

36. It is not possible to determine, merely by knowing a cellular telephone's make, model, and serial number, the nature and types of services to which the devices are subscribed, and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as

personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices—both phones and tablets—over the internet and remotely destroy all of the data contained on the devices. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones and tablets do not have hard drives or hard-drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models, and some tablets, using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

37. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and any associated memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

38. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

39. No prior attempts to obtain the evidence sought by this warrant were made.

11

*Affidavit in Support of Search Warrant*

# CONCLUSION

40. Based on all the facts and circumstances described above, I believe probable cause exists to conclude that RECORD used the **Target Device** to facilitate the offense of drug smuggling and to communicate with co-conspirators. The **Target Device** was likely used to facilitate the offense by transmitting and storing data, which constitutes evidence and instrumentalities of violations of Title 21, United States Code, Sections 952 and 960.

41. Because the **Target Device** was promptly seized following the arrest of RECORD at the OTM, there is probable cause to believe that evidence of the smuggling offense committed by them continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from June 1, 2019, up to and including September 16, 2019.

42. WHEREFORE, I request that the court issue a warrant authorizing HSI Special Agents and/or other federal and state law enforcement officers specially trained in digital evidence recovery, to search the **Target Device**, as described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
SAMUEL C. GOODWIN
Homeland Security Investigations Special Agent
Department of Homeland Security

Subscribed and sworn to before me on this 23rd day of October, 2019.

_____
KAREN S. CRAWFORD
United States Magistrate Judge

*Affidavit in Support of Search Warrant*

# Attachment A

### *Item to be Searched*

The item to be searched is as follows:

>One Apple iPhone 7 Plus
>IMEI No 356695088721789

The **Target Device** is currently in the possession of Customs and Border Protection and is presently stored at 9777 Via De La Amistad, San Diego, CA 92154.

1

*Affidavit in Support of Search Warrant*

## Attachment B

### *Items to be Seized*

Authorization to search the cellular/mobile telephone described in Attachment A (the "**Target Device**") includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, from June 1, 2019 up to and including September 16, 2019:

a. tending to indicate efforts to import methamphetamine, heroin, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, heroin, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, heroin, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, heroin, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to

distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points;

  e. tending to identify the movement of proceeds associated with the trafficking of methamphetamine, heroin, or some other federally controlled substance that was imported from Mexico into the United States;

  f. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

  g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 952 and 960.

*Affidavit in Support of Search Warrant*